UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ELAINE TALBOTT-SERRANO,

                             Plaintiff,

       - against -

IONA COLLEGE, BEVERLY AZURE, JOHN
DOES 1-10 and XYZ CORP. 1-10,

                         Defendants.
-------------------------------------------------------------x

**OPINION & ORDER**

No. 21-CV-1055 (CS)

<u>Appearances</u>:

Ty Hyderally
Francine Foner
Hyderally & Associates, P.C.
Montclair, New Jersey
*Counsel for Plaintiff*

Erin Durba
Harrington, Ocko & Monk, LLP
White Plains, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

     Before the Court is the motion for summary judgment of Defendants Iona College and

Beverly Azure.  (ECF No. 24.)  For the following reasons, Defendants' motion is GRANTED.

## I.     <u>BACKGROUND</u>

     This case arises out of the alleged discrimination and retaliatory termination that Plaintiff

Elaine Talbott-Serrano claims to have experienced at her former workplace, Iona College

("Iona").

A.    **Facts**

The following facts are based on the parties' Local Civil Rule 56.1 Statements,

responsive 56.1 Statements,[1] and supporting materials, and are undisputed except as noted.

1.    **Plaintiff's Initial Position**

Plaintiff Elaine Talbott-Serrano began her employment at Iona on March 11, 2019 as a

Student Records Coordinator ("SRC") in the registrar's office, (Ds' 56.1 Stmt. ¶¶ 1, 9; ECF No.

28-2 ("P's Depo.") at 12:9-14), and worked in that position until she was promoted on January 6,

2020, (Ds' 56.1 Stmt. ¶¶ 8, 11).  She was ultimately terminated on May 28, 2020.  (*Id.* ¶ 4.)

Defendant Beverly Azure was hired as Iona's Registrar on February 10, 2020, (*id.* ¶ 2), and

served as Plaintiff's direct supervisor until Plaintiff's termination, (P's 56.1 Stmt. ¶ 3).  Plaintiff

suffers from a disability:  congenital heart disease.  (P's Depo. at 10:9-14; ECF No. 28-5 at 31[2].)

She has had two heart surgeries and ablation and experiences arrythmias and hypertension, (P's

Depo. at 10:15-18; ECF No. 28-5 at 31) – all of which place her at an increased risk should she

contract COVID-19.  (P's 56.1 Stmt. ¶ 6; ECF No. 28-5 at 31.)  Prior to March 9, 2020, Plaintiff

---

[1] I will refer to Defendants' Rule 56.1 Statement of Material Facts, (ECF No. 30), as "Ds'
56.1 Stmt."  I will refer to Plaintiff's Response to Defendants' Rule 56.1 Statement of Material
Facts and Plaintiff's Statement of Additional Material Facts, (ECF No. 35), as "P's 56.1 Stmt."
But Plaintiff's 56.1 Stmt., to the extent it goes beyond responding to Defendants' 56.1 Stmt. or
setting out allegedly disputed issues, is not authorized.  Local Rule 56.1 permits only a
counterstatement of "additional material facts as to which it is contended that there exists a
genuine issue to be tried."  Local Civ. R. 56.1(b).  "There is no provision for a responsive 56.1
Statement to include additional facts that are not in dispute but that a party opposing summary
judgment simply thinks are important; any additional facts should be confined to material facts in
dispute."  *Ostreicher v. Chase Bank USA, N.A.*, No. 19-CV-8175, 2020 WL 6809059, at *1 n.1
(S.D.N.Y. Nov. 19, 2020).  Despite the impropriety of Plaintiff's submission, I have considered
it.  I will refer to Defendants' Reply to Plaintiff's Rule 56.1 Response, (ECF No. 37), as "Ds'
Resp. to P's 56.1."

[2] Citations to ECF No. 28-5 refer to the page numbers generated by the Court's electronic
filing system.

neither informed Azure of her heart condition, (Ds' 56.1 Stmt. ¶ 6), nor was discriminated against due to her disability, (*id.* ¶ 5).

As an SRC, Plaintiff's responsibilities included assisting students who came to the registrar's office, (*id.* ¶ 9), and according to Plaintiff, "independently servicing students' needs, training temporary employees, assisting other team members in the Registrar's Office," "following up on emails and communications, becom[ing] fully trained as backup on the Parchment SEND system," "helping with registering all types of students, recognizing the student groups and procedures unique to each group, and being versant in PeopleSoft screens." (P's 56.1 Stmt. ¶ 9; P's Depo. at 13:14-14:4; *see* ECF No. 27-1.)  While serving as an SRC, Plaintiff received one formal written review, (ECF No. 28-3 ("Smith Depo.") at 31:15-32:3), which was completed in November 2019 by Kelly-Anne Giannone, (ECF No. 27-1 at 2), who at the time served as the Acting Registrar, (ECF No. 27 ("Giannone Decl.") ¶ 1).  The review was generally positive; among other things, Giannone noted Plaintiff was "extraordinarily adaptable," was a "critical team member," and had "good communication skills."  (ECF No. 27-1 at 2.)

### 2.  Plaintiff's Promotion

On January 6, 2020, due to her "very good" job performance, (ECF No. 26 ("Steele Decl.") ¶ 2), Plaintiff was promoted to Transcript, Scheduling and Catalog Coordinator ("TSCC"), (ECF No. 28-24).  According to Plaintiff, as TSCC, her responsibilities included transcript processing, classroom scheduling, withdrawals and registration, helping out at the front desk, assisting the SRC, registering visiting students, updating student information, and registering students for the High School Links Program.  (P's 56.1 Stmt. ¶ 13; P's Depo. at 21:10-19, 22:5-12.)  As a result of her promotion, Plaintiff was placed on a 90-day "introductory period" during which she would be "evaluated on [her] job performance, how well [she]

manage[d] [her] responsibilities, and [her] interaction with other employees and members of the Iona Community."  (ECF No. 28-24.)  Prior to her new position, Plaintiff had not done classroom scheduling.  (Ds' 56.1 Stmt. ¶ 14.)

To supplement her own efforts to learn the responsibilities of her new position, Plaintiff received some training from Giannone and Renata Couto, (Giannone Decl. ¶ 7; P's Depo. at 23:6-24:18), the latter of whom served as a compliance coordinator at the time, (ECF No. 28-1 ("Azure Depo.") at 41:5-14.  By the time Azure came on board as registrar on February 10, 2020, Plaintiff believed she had learned her position well enough to be self-sufficient.  (Ds' 56.1 Stmt. ¶ 15.)  By early 2020, however, Giannone had developed concerns about Plaintiff's job performance.  (*Id.* ¶ 16.)  According to Giannone, Plaintiff "did not seem to be comfortable with her new job responsibilities" and "seemed to procrastinate when she had to do tasks that were new to her."  (Giannone Decl. ¶ 8.)  She also claims that Plaintiff "frequently asked the same questions multiple times," "had difficulty troubleshooting issues she should have been able to resolve on her own, and would instead rely on Ms. Couto or me to solve the problems for her." (*Id*. ¶ 9.)  Joanne Steele, the Vice Provost and Chief Information Officer at Iona, oversaw the registrar's office and also noted that Plaintiff frequently interrupted Giannone and Couto with questions or requests for assistance.  (Steele Decl. ¶¶ 1, 4.)  Azure claims that Plaintiff was sent "several emails" that documented "the errors that she was making."  (Azure Depo. at 68:7-20.) Plaintiff contends that Giannone did not give her any warnings or criticism regarding her performance, nor was she given any written write-ups, prior to being placed on a Performance

Improvement Plan ("PIP") on March 31, 2020.  (ECF No. 34 ("P's Decl.") ¶ 15; ECF No. 33 Ex. C at 59:20-60:2.)[3]

To minimize the interruptions, which were interfering with Giannone's and Couto's ability to concentrate on their own work, (Giannone Decl. ¶ 9; Steele Decl. ¶ 4; Azure Decl. ¶ 6), Giannone set aside time to answer any of Plaintiff's questions, (Giannone Decl. ¶ 9).  Plaintiff, however, claims that "the Q & A meetings were for the team, not an individual meeting with me," and she was never warned about any interruptions.  (P's Decl. ¶ 8.)

On February 14, 2020, Plaintiff left a maintenance worker unattended in a file room containing confidential student records and forgot to lock the door after the worker had left. (Azure Decl. ¶ 7; Steele Decl. ¶ 6; Giannone Decl. ¶ 11; ECF No 27-2 (text from Plaintiff saying, "Joanne is upset bc no one stayed with Marty the[] entire time he was fixing the machine and [M]arty left the door open when he left and I forgot to close it").)  Defendants claim that this was a serious mistake because it put the school at risk of potentially violating the Family Educational Rights and Privacy Act, which requires the school to protect the confidentiality of student information, (Giannone Decl. ¶ 11), which Steele explained to Plaintiff, (Ds' 56.1 Stmt. ¶ 21; Steele Decl. ¶ 6).  According to Steele, when she spoke with Plaintiff about the incident, Plaintiff "seemed to have no reaction and did not seem to understand the seriousness of her mistake."  (Steele Decl. ¶ 6.)  Plaintiff, on the other hand, claims that the incident was not solely her fault because she "was covering the front desk alone and unable to leave," so Giannone or Azure "should have attended to the maintenance worker and ensure[d] that the door was locked."

---

[3] Denise Smith's deposition is attached as ECF No. 28-3 and supplemented by Exhibit C to ECF No. 33.  This Court will refer to both exhibits, taken together, as the "Smith Depo."

(P's Decl. ¶ 11.)  In any case, Plaintiff claims that she "did not receive any warning from anyone that this was [her] fault or that this reflected any issue with [her] performance."  (*Id.*)

Around February 17, 2020, over the holiday weekend, Plaintiff engaged in text and phone conversations with Azure, Giannone, and Couto to address who would work late on a particular Tuesday to cover for Couto.  (P's Depo. at 30:24-35:5; ECF No. 25-1; ECF No. 34 Exs. B-C.) By the end, Plaintiff stated, "I can do the late night tomorrow . . . .  But this doesn't work for me when Renata is off," and "I cannot be your backup if no one else is."  (ECF No. 34 Exs. B-C.) She testified, "[I]t wasn't fair just for myself and Renata to do it."  (P's Depo. at 34:24-35:5.) According to Defendants, her complaints were an issue because "occasional evening work is part of [Plaintiff's] job description," (Azure Decl. ¶ 8), and "complaining about [working the late shift] via text on a weekend would not make a good impression on [Plaintiff's] new supervisor," (Steele Decl. ¶ 7).

On February 23, 2020, Azure approached Plaintiff to discuss her stress about the new position and offered her the opportunity to return to her previous SRC position.  (P's Depo. at 42:15-44:4; ECF No. 28-8 at 2), given that Plaintiff had indicated that she was anxious about the TSCC job because she was "trying to get everything right."  (P's Depo. at 40:21-42:14; ECF No. 28-8 at 2.)  But Plaintiff refused and clarified that she was "very excited about the new position and [she] wanted to stay and continue in [her] new position.  (P's Depo. at 43:17-22.)

Plaintiff subsequently began to keep her own notes about the interactions that she had with Azure, covering the period from February 23, 2020 through March 6, 2020.  (P's Depo. at 38:10-40:20; ECF No 28-8.)  These notes kept track of "[w]hatever [Plaintiff] felt [Azure] did that just didn't feel right" because Plaintiff did not like "how [Azure] made [Plaintiff] feel when she first started."  (P's Depo. at 38:23-40:7.)  The notes reflect, among other things, that Azure

ignored Plaintiff, texted while Plaintiff was speaking with her, called another employee "stupid," was "extremely rude," consulted other employees when she should have been consulting Plaintiff, "constantly avoid[ed]" Plaintiff, and attended a meeting without Plaintiff that Plaintiff felt she should have attended.  (ECF No. 28-8 at 2-5.)  Plaintiff also mentioned that Azure had not formally introduced herself to Plaintiff, did not sit with Plaintiff "to go over anything like she did with [Giannone] and [Couto]," and, in contrast to Azure's relationship with Plaintiff, was "very close" with Giannone and Couto.  (P's Depo. at 36:20-37:23, 48:25-49:16.)

After Azure approached Plaintiff about returning to her old position, Plaintiff met with Denise Smith, the Human Resources Director at Iona.  (P's Depo. at 92:16-93:8; Smith Depo. at 26:1-8.)  During this meeting, which occurred sometime between February 23, 2020 and March 6, 2020, Plaintiff told Smith about "how [she] felt very uncomfortable with the way [Azure] was," specifically mentioning that Azure "didn't introduce herself in the beginning when she first started working there" and "didn't speak to [Plaintiff]," and that Plaintiff "didn't feel comfortable when [Azure] started."  (P's Depo. at 93:9-25.)  Plaintiff also met with Steele, (Steele Decl. ¶ 8; ECF No. 26-1), where she complained that Azure was "rude and overly harsh" toward her, (Steele Decl. ¶ 8).  Steele claims that she gave Plaintiff the opportunity to return to her old position as the SRC, (*Id.*), while Plaintiff claims that she was not given any such opportunity at the meeting, (P's 56.1 Stmt. ¶ 31).  Both Smith and Steele spoke to Plaintiff about trying to work with Azure and adapt to her management style.  (Smith Depo. at 26:1-8; Steele Decl. ¶ 8.)

### 3.  COVID-19 Pandemic

On March 9, 2020, Plaintiff submitted to Iona's Human Resources department a doctor's note that informed the department of Plaintiff's heart condition and stated, "With the COVID-19

situation she should be allowed to work from home."  (ECF No. 28-10 at 3.)  Plaintiff's request

was granted the same day, and she began working from home on March 10, 2020.  (ECF No. 28-

11 at 2; ECF No. 28-25; P's Depo. at 40:13-16, 95:16-98:7.)  Azure sent Plaintiff an email on

March 9th outlining her responsibilities working from home, (ECF No. 28-11 at 2), had

Plaintiff's work phone forwarded to her cell phone, (P's Depo. at 108:5-9), gave Plaintiff access

to a report that she needed, (*id*. at 108:9-110:24), and arranged for Plaintiff's participation in

interviews for the new SRC, (Azure Decl. ¶ 13; P's Depo. at 68:18-22).

 Plaintiff claims that her transition to working from home did not go so smoothly.  (P's

56.1 Stmt. ¶ 35.)  It is undisputed that Plaintiff was able to complete tasks related to "classroom

scheduling, processing transcripts, addressing 25 Live requests, answering emails, and answering

and responding to phone calls and voicemails."  (Ds' 56.1 Stmt. ¶ 38.)  It is also undisputed that

Plaintiff was able to access her Iona email, the Registrar email account (registrar@iona.edu),

Parchment, PeopleSoft, and 25 Live.  (*Id.* ¶ 39.)  But Plaintiff takes issue with her lack of VPN

access.  (*See* P's 56.1 Stmt. ¶¶ 84-86; P's Depo. at 98:23-104:7; ECF No. 33 Ex. A ("Monroy

Depo.") at 41:25-42:23.)  Plaintiff claims that Azure failed to approve her VPN access, which

she allegedly requested "a few times" while working remotely, (P's 56.1 Stmt. ¶¶ 84-86; P's

Depo. at 98:23-104:7; Monroy Depo. at 41:25-42:23), while Azure claims that Plaintiff "said she

didn't need VPN access," (Azure Depo. at 46:12-24.  Azure testified that Plaintiff needed to put

in a request to obtain VPN access to IT, but "[i]t was never put [in]."  (*Id.* at 47:15-48:21.)

According to Plaintiff's testimony, the other team members in the registrar's office were given

VPN access.  (P's Depo. at 102:15-103:4.)  The lack of access allegedly hindered Plaintiff's

ability to work on "visiting students and High School Links," (P's Depo. at 98:23-99:18;

Monroy Depo. at 41:25-42:23), and made it impossible to access her files and notes on her work desktop, (P's Decl. ¶ 21).

Plaintiff also takes issue with differential treatment she allegedly faced at the hands of Azure once she began working remotely.  Plaintiff points to the email that she received from Azure regarding her responsibilities while working from home, which Plaintiff characterizes as "plac[ing] numerous restrictions and demands upon [Plaintiff] as conditions for her being able to work remotely from home."  (P's 56.1 Stmt. ¶ 35; *see* ECF No. 28-11 at 2.)  The email set forth Plaintiff's working hours, her obligation to check email and voicemail, and the work that she was to do.  (ECF No. 28-11 at 2.)  Azure testified that she did not recall giving similar guidelines for remote work to other employees after everyone began working from home, but said it was because they, unlike Plaintiff, were exempt employees not paid by the hour.  (Azure Depo. at 44:17-46:6; *see* P's 56.1 Stmt. ¶ 35.)  Finally, temporary employee Kayla Monroy alleges that Azure told her, Giannone, and Couto "to make sure that [Plaintiff] is doing her job, that she was lazy, . . . [and] that she should not be working from home."  (Monroy Depo. at 43:3-44:2.)

On March 17, 2020, Iona announced that all employees who could do so should work from home beginning the following day.  (ECF No. 25-4 at 2-3.)  Azure, Giannone, and Couto began working from home on March 18, 2020.  (Azure Decl. ¶ 14; P's Depo. at 112:3-8.)  The following day, Azure began holding daily team conference calls.  (P's Depo. at 112:9-19; Azure Decl. ¶ 15; *see* ECF No. 25-6 at 3.)  Plaintiff claims that she was "stressed out" when she was on team calls, Azure was assigning her work to other people on the team during the calls, and Azure was "disrespectful" and would cut her off while she was speaking."  (P's Depo. at 124:9-21, 126:2-10.)  Defendants claim that Plaintiff fully participated other than when she was late or when she asked to be excused for personal reasons.  (Azure Decl. ¶ 15; Giannone Decl. ¶ 14; *see*

P's Depo. at 112:9-19.)  Giannone states that she "did not witness any instances in which Ms. Azure treated [Plaintiff] differently.  Ms. Azure has a very direct, no-nonsense communication style with everyone, and she demands efficiency and competence from everyone on the team.  I noticed that [Plaintiff] seemed to have difficulty adapting to this style."  (Giannone Decl. ¶ 15.)

### 4.  Issuance of the Performance Improvement Plan ("PIP")

In March 2020, Azure and Steele continued to have concerns about Plaintiff's job performance.  (Azure Decl. ¶¶ 16-18; Steele Decl. ¶¶ 9-10; ECF No. 25-9 at 6; ECF No. 26-2 at 2.)  Steele documented her concerns in an email she sent to Smith on March 23, 2020.  (ECF No. 26-2 at 2.)  Among other things, Steele mentioned some errors that Plaintiff had made in the course of her work, as well as some issues that Plaintiff had apparently "unnecessarily" escalated, but noted that Azure

> is not a gentle touch. . . .  My guess is her coaching skills are weak and she is probably not very patient.  I personally worked very well with [Plaintiff] which is why I promoted her, that said perhaps the new role is too challenging.  I really like [Plaintiff] and hope that we can help them work things out.

(*Id.*)  As to these errors, Plaintiff claims that they were not her fault but were instead "an IT issue."  (P's 56.1 Stmt. ¶ 47; *see* ECF No. 26-4 at 2-4.)  Azure also emailed Smith on March 24, 2020 documenting her concerns with Plaintiff's work.  (ECF No. 25-9 at 2.)  Azure said Plaintiff "[l]acks basic troubleshooting skills," "[r]equires direction several times a day," and "[is] [n]ot a team player."  (*Id.* at 6.)  Neither Steele nor Azure mentioned Plaintiff's disability or her request to work from home in their emails.  (ECF No. 26-2; ECF No. 25-9.)

To allow Plaintiff to focus on classroom scheduling, a new task for her, Azure reassigned some of her responsibilities to others, specifically high school links, visiting students, and transcript processing, (Azure Decl. ¶ 17; P's Depo. at 126:17-19), the first two being those that Plaintiff had been unable to do without VPN access, (P's Depo. at 126:20-24).  Azure testified

that Plaintiff "told me she felt very good about scheduling and she was – it was very helpful that I took the responsibilities away from her so she could focus on that." (Azure Depo. at 84:24-85:2; ECF No. 25-12 at 3.) Plaintiff disputes any implication that she welcomed the workload reduction. (P's 56.1 Stmt. ¶ 48; *see* ECF No. 33 Ex. D at 17 (notes of Denise Smith stating that "[Azure] assigned Gabriella the work which [Plaintiff] felt was her work. This made [Plaintiff] feel bad.").) Plaintiff testified in her deposition that Azure "took away some tasks that were my responsibilities and she was very forceful with her voice." (P's Depo. at 126:2-10.)

Plaintiff also contacted Smith via email to discuss her relationship with Azure. (ECF No. 28-15 at 2; ECF No 28-16 at 2; P's Depo. at 118:8-128:3.) Plaintiff specifically complained that Azure was "cut[ting] [Plaintiff] off when [Plaintiff] was speaking and was disrespectful," (P's Depo. at 124:18-21), and that "the situation has gotten worse," (ECF No. 28-16 at 3).

Smith, Steele, and Azure agreed to create a PIP for Plaintiff, (Steele Decl. ¶ 11; Azure Decl. ¶¶ 19-20; Azure Depo. at 60:10-61:9; Smith Depo. at 50:10-51:25), which began on March 31, 2020, (ECF No. 28-18 at 3-4.) The PIP extended the probationary period by sixty days and was "intended to define areas of concern, gaps in [Plaintiff's] work performance, reiterate Iona College's expectations, and allow [Plaintiff] the opportunity to demonstrate improvement and commitment." (*Id*. at 3.) The PIP also listed areas of concern with Plaintiff's performance, including her communication skills, attention to detail, judgment, and multi-tasking ability. (*Id*.) Finally, the PIP included an explanation of the timeline for improvement, consequences should Plaintiff fail to improve, and expectations of Plaintiff throughout the time she was on the PIP. (*Id*.) The PIP did not reference Plaintiff's heart condition or her request to work from home considering the COVID-19 pandemic. (*Id*.)

In accordance with the PIP, Plaintiff and Azure had weekly phone meetings during April and May to discuss "what the progress was, to see how [Plaintiff] was doing." (P's Depo. at 151:13-21; Azure Decl. ¶ 21.) Azure sent her summaries of those meetings after they took place. (P's Depo. at 151:22-24; Azure Decl. ¶ 21; *see, e.g.*, ECF No. 25-11 at 2-3; ECF No. 25-12 at 2-3; ECF No. 25-13 at 2-4; ECF No. 33 Ex. E.) Plaintiff testified that Azure did not discuss in the weekly progress meetings some of the tasks in the summaries. (P's Depo. at 151:22-153:18.)

In late April and early May, Plaintiff felt that her interactions with Azure were better: she testified that Azure's attitude toward her "improved," Azure listened to her more "towards the end," and "things were getting slightly better." (*Id*. at 155:18-160:17.) Azure subsequently returned some of Plaintiff's responsibilities to her on May 1, 2020 after Plaintiff informed Azure that she had completed all the scheduling. (Azure Depo. at 79:25-82:18, 84:18-21, 85:22-86:1; P's Depo. at 153:19-155:13.) Additionally, nothing "happen[ed] between May 1st and the time [Plaintiff was] terminated that [Plaintiff] had concerns about or that [Plaintiff] felt [was] discriminatory." (P's Depo. at 159:24-160:17.)

### 5. Plaintiff's Termination

Despite the PIP and the weekly meetings with Azure, Giannone and Azure continued to document several issues with Plaintiff's job performance in April and May. (Giannone Decl. ¶¶ 18-21; Azure Decl. ¶¶ 21-23; *see* ECF No. 27-4 at 2; ECF No. 27-5 at 2-3; ECF No. 27-6 at 2-3, 5.) Giannone was concerned that Plaintiff "failed to properly troubleshoot issues with the students," "gave out incorrect information," "made mistakes in communicating with students and others in the office," and was unable to "resolve issues . . . without my help." (Giannone Decl. ¶¶ 18-20.) Azure raised concerns about Plaintiff's "failure to properly troubleshoot issues; failure to follow protocols with respect to sending emails; failure to provide complete and

accurate information; and failure to properly input student information."  (*Id*. ¶ 21; *see* ECF No. 25-11 at 2-3; ECF No. 25-12 at 2-3; ECF No. 25-13 at 2-4; ECF No. 25-14 at 2; ECF No. 25-15 at 2; ECF No. 25-16 at 2; ECF No. 25-17 at 2.)  Plaintiff characterizes these issues as "ordinary work emails troubleshooting various student registration issues and correctly handling student inquiries" that somehow do not reflect "performance issues" on her part.  (P's 56.1 Stmt. ¶¶ 59-60.)  Plaintiff also claims that the May 15th final progress report for Plaintiff contained no indication that she had not satisfied the requirements of the PIP.  (P's 56.1 Stmt. ¶ 55; Smith Depo. at 81:10-82:3; *see* ECF No. 33 Ex. E at 23.)

Near the end of May, Azure, Smith, and Steele discussed Plaintiff's job performance: "[t]he consensus during the call was that [Plaintiff's] performance had not improved and that she had not demonstrated to us that she was capable of handling the responsibilities of her position." (Steele Decl. ¶ 12; Azure Decl. ¶ 25; Azure Depo. at 86:2-89:2; Smith Depo. at 83:19-86:17.) Although Azure was the one who originally recommended terminating Plaintiff, (Azure Depo. at 88:11-12), all three "agreed that [Plaintiff] should be terminated," (Steele Decl. ¶ 12; *see* Azure Decl. ¶ 25; Azure Depo. at 86:2-89:2; Smith Depo. at 83:19-86:17.)  Steele, who "had the final decision-making authority on [Plaintiff's] termination," (Smith Depo. at 84:8-11), noted that she "approved the termination based on my own observations of [Plaintiff's] difficulties with her job responsibilities and the recommendations of Ms. Azure and Ms. Smith," (Steele Decl. ¶ 12). Plaintiff's heart condition and her request to work from home were not discussed during these conversations.  (Steele Decl. ¶ 12; Azure Decl. ¶ 25; Smith Depo. At 84:5-85:19.)  Plaintiff's employment was subsequently terminated on Thursday, May 28, 2020.  (P's Depo. At 10:6-8.) The PIP period would have ended on Saturday, May 30.  (*See* ECF No. 28-18 at 3.)

### B.    Procedural History

Plaintiff brought this suit on February 5, 2021, against Defendants Iona, Azure, John

Does 1-10, and XYZ Corp. 1-10,[4] asserting claims of race discrimination and retaliation under

Title VII of the Civil Rights Act of 1964; discrimination, hostile work environment, failure to

accommodate, failure to engage in the "interactive dialogue," and retaliation under the

Americans with Disabilities Act of 1990 ("ADA"); and race discrimination, disability

discrimination, hostile work environment, and retaliation under the New York State Human

Rights Law ("NYSHRL").  (ECF No. 1 ("Compl.") ¶¶ 118-159.)  On November 2, 2021, after

the conclusion of discovery, Defendants submitted a pre-motion letter in anticipation of its

motion for summary judgment.  (ECF No. 18.)  On November 16, 2021, the Court held a

conference, at which Plaintiff agreed to drop the federal and state race-based claims.  (Minute

Entry dated Nov. 16, 2021.)  The instant motion followed. (ECF Nos. 24-37.)

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

---

[4] The Court dismisses all claims against John Does 1-10 and XYZ Corp. 1-10 without prejudice.  Discovery has concluded in this case and Plaintiff has failed to identify or present evidence demonstrating the involvement of these Defendants.  "It is well settled that where a plaintiff has made no attempt to amend its complaint to include the real identities of John Doe Defendants and discovery has closed, the proper course is to dismiss the John Doe Defendants without prejudice."  *Cox. Village of Pleasantville*, 271 F. Supp. 3d 591, 618 (S.D.N.Y. 2017); *see Sachs v. Cantwell*, No. 10-CV-1663, 2012 WL 3822220, at *10 (S.D.N.Y. Sept. 4, 2012) ("Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss those Defendants without prejudice.") (cleaned up).

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of

material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence

sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d

Cir. 2008).  "The mere existence of a scintilla of evidence in support of the [non-movant's]

position will be insufficient; there must be evidence on which the jury could reasonably find for

the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than

simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory

allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423,

428 (2d Cir. 2001) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations . . .

admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Where a

declaration is used to support or oppose the motion, it "must be made on personal knowledge, set

out facts that would be admissible in evidence, and show that the . . . declarant is competent to

testify on the matters stated."  *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino,*

*Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address

another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact

undisputed for purposes of the motion" or "grant summary judgment if the motion and

supporting materials – including the facts considered undisputed – show that the movant is

entitled to it." Fed. R. Civ. P. 56(e).

## III.   DISCUSSION

Plaintiffs brings claims against Iona and Azure, alleging discrimination based on

disability, hostile work environment, and retaliation in violation of the ADA, (*see* AC ¶¶ 127-

132, 144-147), and the NYSHRL, (*see id.* ¶¶ 152-159).[5]  Plaintiff also asserts a failure-to-

accommodate claim under the ADA.  (*See id.* ¶¶ 133-143.)  Plaintiff consents to dismissing all

ADA claims against Azure but argues she can be held liable under the NYSHRL.  (ECF No. 32

("P's Opp.") at 24.)  Defendants argue they are entitled to summary judgment on all claims.

(ECF No. 29 ("Ds' Mem.") at 2.)

### A.   ADA Claims

#### a.   Discrimination Claim

Plaintiff's disability discrimination claims under federal and state law[6] are analyzed

under the familiar burden-shifting framework established by the Supreme Court in *McDonnell*

---

[5] Plaintiff discusses the New York City Human Rights Law ("NYCHRL") in her memorandum despite making no NYCHRL claims in the Complaint.  "It is black letter law that a party may not raise new claims for the first time in opposition to summary judgment."  *Manley v. Grossman*, No. 13-CV-1974, 2017 WL 4326541, at *11 (S.D.N.Y. Sept. 27, 2017) (cleaned up) (collecting cases).  I will therefore not address any claims under the NYCHRL.  Further, Iona is located in Westchester County and Plaintiff does not allege that any discriminatory actions took place in the five boroughs, so no NYCHRL claim could be brought anyway.  *See Reyes v. Westchester Cnty. Health Care Corp.*, No. 19-CV-8916, 2021 WL 310945, at *5-6 (S.D.N.Y. Jan. 29, 2021), *aff'd*, No. 21-0410, 2021 WL 4944285 (2d Cir. Oct. 25, 2021), *cert. denied*, 142 S. Ct. 1671 (2022); *Spilkevitz v. Chase Inv. Servs. Corp.*, No. 08-CV-3407, 2009 WL 2762451, at *5 (E.D.N.Y. Aug. 27, 2009).

[6] It had been the case that "[a] claim of disability discrimination under the New York State Human Rights Law . . . is governed by the same legal standards as govern federal ADA

*Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Kovaco v. Rockbestos-Surprenant Cable*

*Corp.*, 834 F.3d 128, 136 (2d Cir. 2016); *McMillan v. City of N.Y.*, 711 F.3d 120, 125 (2d Cir.

2013); *Munoz-Nagel v. Guess, Inc.*, No. 12-CV-1312, 2013 WL 1809772, at *4 n.5 (S.D.N.Y.

Apr. 30, 2013).

> Under that framework, a plaintiff must first establish a *prima facie* case of
> discrimination, which causes the burden of production to shift to the defendant to
> offer a legitimate, nondiscriminatory rationale for its actions.  If the defendant
> satisfies its burden of production, then the presumption raised by the *prima facie*
> case is rebutted and drops from the case, such that at the final stage, the plaintiff
> then has the opportunity to demonstrate that the proffered reason was not the true
> reason for the employment decision.

*Kovaco*, 834 F.3d at 136 (cleaned up).  In demonstrating that the employer's proffered reason

was not the true reason for the employment decision, a plaintiff "must produce not simply some

evidence, but sufficient evidence to support a rational finding that the legitimate, non-

discriminatory reasons proffered by the defendant were false, and that more likely than not

discrimination was the real reason for the employment action."  *Weinstock v. Columbia Univ.*,

224 F.3d 33, 42 (2d Cir. 2000) (cleaned up), *superseded by statute on other grounds as stated in*

*Ochei v. Coler/Goldwater Mem'l Hosp.*, 450 F. Supp. 2d 275, 282-83 (S.D.N.Y. 2006).  "In

short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational

inference of discrimination."  *Id.*  Plaintiff must "prove that discrimination was the but-for cause

of any adverse employment action."  *Natofsky v. City of N.Y.*, 921 F.3d 337, 348 (2d Cir. 2019).

---

claims."  *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006).  The New York
state legislature amended the NYSHRL on August 12, 2019, to "establish that its provisions
should be construed liberally even if federal civil rights law, including those laws with
provisions worded comparably to the provisions of this article, have been construed narrowly.
The effect of that amendment is to render the standard for claims closer to the [more liberal]
standard under the NYCHRL."  *Syeed v. Bloomberg L.P.*, No. 20-CV-7464, 2022 WL 3447987,
at *6 (S.D.N.Y. Aug. 17, 2022) (cleaned up).  These amendments apply to claims that accrued on
or after October 11, 2019, which covers the time frame of Plaintiff's allegations here.

To establish a *prima facie* case of discrimination based on disability, a plaintiff must show:  "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered [an] adverse employment action because of his disability."  *Cameron v. Cmty. Aid for Retarded Child., Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) (cleaned up).  To carry his burden on the fourth element of the *prima facie* case, Plaintiff "has a *de minimis* burden to produce direct or circumstantial evidence that would lead a reasonable fact-finder to conclude that her discharge occurred under circumstances giving rise to an inference of discrimination."  *Duprey v. Prudential Ins. Co. of Am.*, 910 F. Supp. 879, 885 (N.D.N.Y. 1996).  Defendant Iona argues that Plaintiff cannot prove that she was terminated because of her disability.  (Ds' Mem. at 15-16.)

Defendant argues that the only employment action that is materially adverse under the ADA was Plaintiff's termination, (Ds' Mem. at 15-16), and Plaintiff in her opposition cites only her termination as a materially adverse action, (P's Opp. at 9).  Defendant contends that Plaintiff has not provided evidence that that action was taken *because* of her disability.  (Ds' Mem. at 16-21.)  *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."); *Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 251 (S.D.N.Y. 2015) ("The relevant question, therefore, is whether Plaintiff presented sufficient evidence that her termination was 'because of' her disability to satisfy her 'minimal burden' of establishing a prima facie case of discrimination under the *McDonnell Douglas* framework.").  Courts must "carefully distinguish between evidence that

allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999).

Plaintiff argues that there is ample evidence to show Defendant Iona "harbored a discriminatory animus against her because of her disability." (P's Opp. at 10.)  Plaintiff informed Defendants Iona and Azure of her disability on March 9, when she requested to work from home, and it is undisputed that she was not discriminated against due to her disability prior to that date and that her request for accommodation was immediately granted. (Ds' 56.1 Stmt. ¶¶ 5-6, 33.)  The events after March 9 to which Plaintiff points are Azure's March 9th email to Plaintiff, Azure's comment to other workers that Plaintiff was lazy, Azure's failure to provide Plaintiff with VPN access, and Azure's tone in dealing with Plaintiff. (P's Opp. at 10-12.)

Plaintiff believes these instances are enough for a reasonable jury to infer that Plaintiff was terminated because of her disability.  The Court disagrees, for the reasons discussed below in connection with the third step of the analysis.  But even if Plaintiff could make out a *prima facie* case, Defendant Iona offers a legitimate, nondiscriminatory reasoning for terminating Plaintiff:  ongoing concerns about her job performance. (Ds' Mem. at 22.)  The record supports this contention.  Azure and others had misgivings about Plaintiff working in her new position even before she informed them of her disability.  Giannone stated that she had concerns about Plaintiff's "performance and attitude" starting in late 2019, (Giannone Decl. ¶ 6), and believed Plaintiff appeared uncomfortable with her new responsibilities in the TSCC position, took a long time to complete tasks, asked the same question multiple times, and needed assistance to resolving multiple issues, (*Id.* ¶¶ 8-9).  Steele also noticed that Plaintiff frequently interrupted Giannone and Couto with questions. (Steele Decl. ¶¶ 1, 4.)  Plaintiff also left a maintenance worker unattended in a file room that had confidential records and forgot to lock the door after

the worker left.  (ECF No. 27-2 at 2.)  To address Plaintiff's apparent anxiety about her new position, Azure offered Plaintiff the opportunity to return to her previous position, which Plaintiff refused.  (P's Depo. at 42:15-44:4; ECF No. 28-8 at 2.)  Emails and texts between Azure and others reflect their concerns about Plaintiff's performance issues.  For example, in a March 24, 2020 email to Azure, Giannone outlined a list of problems with Plaintiff's work, including a change in attitude, continuing to ask the same questions over and over, not being a team player, and communication issues.  (ECF No. 27-3 at 2.)  Azure sent this list, along with her own, to Smith and stated, "I am very concerned the mistakes that she has made would result in law suit and reflect badly on our office."  (ECF No. 25-9 at 2-7.)

Even after instituting the PIP, Azure and others continued to encounter issues with Plaintiff's performance.  On April 4, Giannone sent Azure emails that showed Plaintiff's inability to troubleshoot.  (ECF No. 27-4 at 2-12.)  On April 20 and May 5, Azure outlined to Smith some continued issues with Plaintiff's performance even after being given instructions. (ECF No. 25-15 at 2; ECF No. 25-17 at 2), including an incident where she violated student confidentiality, (ECF No. 25-16 at 2-6.)  "An employer may legitimately take adverse action against an employee when his performance is unsatisfactory or fails to meet expectations." *Petrisch v. JP Morgan Chase*, 789 F. Supp. 2d 437, 447 (S.D.N.Y. 2011); *see Memnon v. Clifford Chance US, LLP*, 667 F. Supp. 2d 334, 352 (S.D.N.Y. 2009); *Fazzari v. Cohen, Pontani, Lieberman & Pavane, LLP*, No. 14-CV-6549, 2019 WL 1258483, at *11 (S.D.N.Y. Mar. 19, 2019).

Because Defendant Iona has met its burden by offering a legitimate, nondiscriminatory reason for terminating Plaintiff, the burden shifts back to Plaintiff to produce evidence that Defendant's reasoning is pretextual.  *See Sista v. CDC Ixis N. Am., Inc*, 445 F.3d 161, 169 (2d

Cir. 2006).  A plaintiff must produce not just some evidence, but sufficient evidence that shows

that the defendant's legitimate, nondiscriminatory reason proffered was false and instead,

discrimination was the real reason for the materially adverse action.  *See Weinstock*, 224 F.3d at

42.  "[A] reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that

the reason was false, *and* that *discrimination* was the real reason."  *St. Mary's Honor Ctr. v.

Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original) (cleaned up).

　　　Plaintiff argues that Defendant Iona's stated justification is pretextual, (P's Opp. at 20-

22), but only by ignoring the import of the well-documented issues to which Defendant points.

Plaintiff dismisses the internal communications about her performance as a "handful of ordinary

work emails and text messages" that Defendant "disingenuously contend reflect performance

issues," arguing that "there was no contemporaneous documentation identifying any of these

emails as reflecting a performance issue."  (*Id* at 21.)  This argument is hard to fathom.  These

emails and text messages are the very contemporaneous documentation that Plaintiff alleges is

missing.  That they do not explicitly state that the outlined concerns raise performance issues

does not render them any less reflective of problematic work, nor does the fact that they do not

explicitly state that the concerns warrant discipline.  Plaintiff's attempt to characterize them as

"ordinary" does not make them less relevant or supportive of Defendant Iona's argument that

Plaintiff continued to have performance issues.  None of these communications discussed or

even mentioned Plaintiff's disability or her request to work from home.

　　　That Plaintiff may regard her treatment by Azure or the concerns expressed about her

performance as unwarranted does not show pretext.  "[I]t is well settled that the mere fact that an

employee disagrees with an employer's evaluation of that employee's misconduct or deficient

performance, or even has evidence that the decision was objectively incorrect, does not

necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination." *Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008), *aff'd*, 360 F. App'x 214 (2d Cir. 2010); *see McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what *motivated* the employer; the factual validity of the underlying imputation against the employee is not at issue.") (cleaned up); *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 509 (S.D.N.Y. 2010) ("[W]hether the complaints against Plaintiff were truthful, and whether, if true, they justify termination, are immaterial disputes."). The fact remains that the record is replete with evidence that Plaintiff's superiors were unhappy with her work in her new position, and is devoid of evidence that Plaintiff's heart condition or working from home for six days before the lockdown had anything to do with it.

Indeed, there is no dispute that Plaintiff was struggling before she revealed her disability. She herself documented Azure's dissatisfaction, and her anxiety rose to the point where she was asked if she wanted her old job back. (ECF No. 28-8 at 2-5.) Giannone noted numerous errors, and office protocols were revised in an effort to cut down on the interruptions from Plaintiff's questions. (ECF No. 25-2; Ds' 56.1 Stmt. ¶ 26.) She also left a maintenance worker unattended in the registrar's filing room. (Steele Decl. ¶ 6; Giannone Decl. ¶ 11; Azure Decl. ¶ 7.) That the poor performance was documented before and after the revelation of the disability shows it was not pretextual. *Cf. Boatright v. U.S. Bancorp*, No. 18-CV-7293, 2020 WL 7388661, at *21 (S.D.N.Y. Dec. 16, 2020) ("critical flaw" in plaintiff's argument for pretext is that performance issues were documented before and after protected activity), *aff'd*, No. 20-4236, 2022 WL 351059 (2d Cir. Feb. 7, 2022), *cert. denied*, 142 S. Ct. 2816 (2022); *Di Giovanna v. Beth Israel*

*Med. Ctr.*, 651 F. Supp. 2d 193, 206 (S.D.N.Y. 2009) (performance issues before and after

FMLA application showed lack of pretext).  Similarly, that Defendant did not impose discipline

or remedial measures sooner does not show pretext.  *Ford v. Am. Signature, Inc.*, No. 18-CV-

1200, 2021 WL 4268298, at *5 (W.D.N.Y. Feb. 19, 2021), *report and recommendation adopted*,

No. 18-CV-1200, 2021 WL 3400564 (W.D.N.Y. Aug. 4, 2021).

That Plaintiff's early performance review from 2019 was positive also does not create a

fact issue as to pretext.  One positive review, from a previous supervisor and related to a prior

position, does not negate the later concerns about her performance.  "A new manager is allowed

to appraise an employee's work according to his or her own expectations, even if those

expectations are contrary to a prior manager's expectations, and inconsistencies in performance

evaluations resulting from a change in management thus do not support a finding of pretext."

*Alejandro v. N.Y.C. Dep't of Educ.*, 2017 WL 1215756, at *15 (S.D.N.Y. Mar. 31, 2017)

(cleaned up) (collecting cases).  While there was some overlap in functions between her previous

position and her new position, many of Plaintiff's performance issues related to her difficulty in

adapting to her new responsibilities.  And even her former supervisor who had written the

previous positive review, Giannone, had a variety of concerns relating to Plaintiff's job

performance in her new role.  (ECF No. 27-3 at 2; ECF No. 27-4 at 2-12.)

Nor does the fact that Plaintiff was terminated before the end of the PIP show pretext.

Plaintiff was continuing to have performance issues after being placed on the PIP, which PIP

makes clear that "[i]mprovement must occur immediately and must be maintained.  If any

portion of this improvement plan is violated at any time during the specified timeframe,

disciplinary action up to and including separation from service may occur."  (ECF No. 25-10 at

4.).  Defendant Iona was entitled to terminate her if it believed – sincerely, even if erroneously –

that she had not sufficiently improved.  Plaintiff's termination also occurred just two days before

the end of the PIP timeframe, which would have fallen on a weekend anyway.

In short, Plaintiff provides no evidence from which a reasonable jury could find that

Defendant's stated reason for her termination was pretextual, let alone a pretext for

discrimination based on disability.  Accordingly, Plaintiff's ADA discrimination claim is

dismissed.

### b. **Failure to Accommodate**

Plaintiff also asserts a failure-to-accommodate claim on the basis that (1) no interactive

process occurred and (2) Defendant Iona failed to accommodate her by not providing her with

VPN access.  (P's Opp. at 14-17.)

To make out a *prima facie* case of failure to accommodate, a plaintiff must establish that

"(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer

covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff

could perform the essential functions of the job at issue; and (4) the employer has refused to

make such accommodations."  *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d

Cir. 2009) (cleaned up).  Defendant Iona argues that Plaintiff's *prima facie* case fails because it

did indeed provide reasonable accommodations.  (Ds' Mem. at 12-14.)

Plaintiff claims Defendant failed to engage in the interactive process.  (P's Opp. at 14-

15.)  "[I]f the employer knew or reasonably should have known that the employee was disabled,"

that employer has an obligation to "engage in an interactive process . . . and in that way work

together to assess whether an employee's disability can be reasonably accommodated."  *Brady v.

Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (cleaned up); *see* 29 C.F.R. § 1630.2

("To determine the appropriate reasonable accommodation it may be necessary for the covered

entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation.").

> An employer engages in an interactive process by, for example, meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the request is too burdensome.

*Sheng v. M&TBank Corp*., 848 F.3d 78, 87 n.3 (2d Cir. 2017) (cleaned up).  "[A]n employer's failure to engage in a good faith interactive process can be introduced as evidence tending to show . . . that the employer has refused to make a reasonable accommodation." *Id.* at 87 (cleaned up).  But "an employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA and evidence thereof does not allow a plaintiff to avoid summary judgment unless she also establishes that, at least with the aid of some identified accommodation, she was qualified for the position at issue." *McBride*, 583 F.3d at 101.  Further, "the ADA imposes no liability for an employer's failure to explore alternative accommodations when the accommodations provided to the employee were plainly reasonable." *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 98 (2d Cir. 2015).

Plaintiff contends that she "sought to engage in an interactive process with regard to her need for VPN access in order to perform her position remotely, . . . [but] she was ignored and not provided with any VPN access."  (P's Opp. at 15.)  "An employer impedes the process when: the employer knows of the employee's disability; the employee requests accommodations or assistance; the employer does not in good faith assist the employee in seeking accommodations; and the employee could have been reasonably accommodated but for the employer's lack of good faith."  *Goonan v. Fed. Rsrv. Bank of N.Y.*, 916 F. Supp. 2d 470, 480 (S.D.N.Y. 2013) (cleaned up).  But here Defendant Iona provided the very accommodation that Plaintiff requested – being able to work from home beginning March 10, 2020, (ECF No. 28-12 at 2; ECF No. 28-

25 at 2) – and thus there was no need for any interactive process.  That Azure provided the parameters for Plaintiff's work from home while the remaining employees were still in the office does not undermine the fact that Defendant granted Plaintiff her requested accommodation.  (*See* ECF No. 28-12 at 2-3.)  That the accommodation came with "restrictions," (P's Opp. at 10), is of no moment.  No reasonable jury would find that an accommodation releases the employee from normal job responsibilities or would regard the parameters Azure set forth to be unreasonable; indeed, they merely reiterated duties Plaintiff had before she started working from home. "[E]mployers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee."  *Noll*, 787 F.3d at 95.  And the interactive process is not required "when the end it is designed to serve – reasonable accommodation – has already been achieved," as here, "when the accommodations provided to the employee were plainly reasonable."  *Id.* at 98.

That Plaintiff asked if she could have VPN access after receiving her requested accommodation, (P's Depo. at 102:3-104:7), does not change the analysis.  Because Defendant Iona granted Plaintiff a plainly reasonable accommodation, it was not required to further engage in the interactive process to address Plaintiff's request for VPN access.  The request for such access was not something Plaintiff required as a result of her disability, or something she needed in order to do the work expected of her.  That Plaintiff thought she should have that resource was not tied to her disability and therefore does not even constitute a request for an accommodation.

Even if it did, however, Plaintiff fails to demonstrate that having VPN access was necessary for her to carry out her job functions.  Plaintiff could perform the majority of her tasks without VPN access, including classroom scheduling, processing transcripts, addressing 25 Live requests, answering emails, and answering and responding to phone calls and voicemails.  (Ds'

56.1 Stmt. ¶ 38.)  She was also able to access her Iona email, the registrar email, Parchment PeopleSoft, and 25 Live without VPN access.  (*Id.* ¶ 39.)  The only tasks for which Plaintiff needed VPN access were registering visiting and high school students, (*id.* ¶ 40; P's 56.1 Stmt. ¶ 43), but these tasks had been reassigned to another employee, (P's Depo. at 104:3-17), so she did not need VPN access to fulfill her responsibilities.  And that Plaintiff's tasks changed after she began working from home also is reasonable, as employers are entitled to make such decisions when granting accommodations.  *See* 29 C.F.R. § 1630 app. (2022) ("[T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide."); *McBride*, 583 F.3d at 97 ("[R]easonable accommodation may include, *inter alia*, modification of job duties and schedules . . . .")  Thus where, as here, an "employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is plainly reasonable." *Noll*, 787 F.3d at 94 (cleaned up).  Because the accommodation here is "plainly reasonable," "[t]here is no need to engage in further burden-shifting to consider whether the employee's requested accommodation would have been reasonable." *Id.* (cleaned up).

Accordingly, Plaintiff's ADA failure-to-accommodate claim is dismissed.

### c.  Retaliation Claim

Plaintiff alleges Defendant Iona retaliated against her by terminating her from her position because she requested an accommodation for her disability.  (P's Opp. at 18.) "Retaliation claims under the . . . ADA, and NYSHRL are governed by the same standards." *Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 268 (S.D.N.Y. 2020).  To establish a *prima facie* case of retaliation, an employee must show that (1) the employee "was engaged in

protected activity, (2) the employer was aware of that activity, (3) the employee suffered a materially adverse action, and (4) there was a causal connection between the protected activity and that adverse action." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 104 (2d Cir. 2020) (cleaned up).  A causal connection may be established "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

"Making a good faith request for an accommodation is a protected activity" under the ADA.  *Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154, 166 (S.D.N.Y. 2020); *see Weixel v. Bd. of Educ.*, 287 F.3d 138, 149 (2d Cir. 2002).  Defendant Iona argues that Plaintiff fails to show a causal connection between her request for an accommodation and her eventual termination.  (Ds' Mem. at 16.)  Plaintiff requested her accommodation, and disclosed her disability, on March 9, 2020, (ECF No. 28-25 at 2), and she was terminated about eleven weeks later on May 28, 2020.  (Ds' 56.1 Stmt. ¶ 4.)  Although the Second Circuit "has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation," *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010); *see Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001), district courts "have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation."  *Beaumont v. Cablevision Sys. Corp.*, No 10-CV-3585, 2012 WL 1158802, at *6 (E.D.N.Y. Apr. 9, 2012) (cleaned up); *see Gilford v. N.Y.S. Off. of Mental Health*, 2020 WL 1529359, at *4 (S.D.N.Y. Mar. 31, 2020) ("Courts in this

Circuit have held that the passage of two months between protected activity and adverse action can be too long, without more, to support an inference of causation."); *Santana v. Mount Vernon City Sch. Dist./Bd. of Educ.*, 2021 WL 4523770, at *11 (S.D.N.Y. Sept. 30, 2021) ("[C]ourts in this Circuit generally hold that a gap longer than two months severs the inferred causal relationship.") (cleaned up).  Given the passage of almost three months between her request and her termination, temporal proximity alone does not support an inference of causation.

In her opposition, Plaintiff points to the following as evidence of retaliatory animus:  (1) Azure's email from March 9th that placed "numerous restrictions and increased supervision" on her work from home; (2) Azure failing to provide Plaintiff with VPN access; (3) Azure's "derogatory" comments to others about Plaintiff; and (4) Azure's dismissive attitude toward Plaintiff.  (P's Opp. at 18-19.)  But no reasonable jury could find that these pieces of evidence – considered either separately or together – evince discriminatory animus on Defendant Iona's part.

First, that Azure sent Plaintiff such an email but did not send a similar one to others when they began working from home does not give rise to any inference of retaliation, for several reasons.  At the time Azure emailed Plaintiff, Plaintiff was the only employee working from home, (Azure Depo. at 44:13-16), so some coordination of her hours and communications with those still working in the office was obviously necessary.  About a week later, the others all began working from home at the same time because of the COVID-19 lockdown. (*Id.*; Ds' 56.1 Stmt. ¶ 35.)  Further, Plaintiff was a nonexempt, hourly employee, unlike the others in the registrar's office.  (Azure Depo. at 45:7-22.)  Finally, as discussed, Azure's email does not include unusual or overly demanding conditions but merely includes information on hours and breaks and outlines responsibilities that Plaintiff previously had.  (ECF No. 28-12 at 2-3.)

Second, that Plaintiff did not have VPN access, while others did, does not show animus. As discussed above, Plaintiff did not require VPN access to carry out her responsibilities and the duties that required VPN access were reassigned to another employee. Other employees, such as Couto and Giannone, who had access to VPN, had different responsibilities, (*see* ECF No. 25-6 at 3), and were senior to Plaintiff, (Giannone Decl. ¶¶ 1, 7).

As to Plaintiff's complaint of Azure's alleged "dismissive attitude" toward her, Plaintiff fails to point to any specific instance of such conduct after she requested an accommodation. Instead, Plaintiff points to incidents that occurred before she reported her disability. (ECF No. 28-8 at 2-4; P's Depo. at 37:4-59:25.) Plaintiff's own notes demonstrate that she felt mistreated by Azure from the start, so the mistreatment could not have been caused by her request for an accommodation. Because "the treatment that [Plaintiff] contends is retaliatory started *before* [s]he engaged in protected activity," her retaliation claim is foreclosed. *Harenton Hotel, Inc. v. Village of Warsaw*, No. 12-CV-235, 2017 WL 4169342, at *8 (W.D.N.Y. Sept. 20, 2017), *aff'd*, 749 F. App'x 17 (2d Cir. 2018). Even if Azure continued to show a dismissive attitude toward Plaintiff after she disclosed her disability, no reasonable jury could find that that attitude had anything to do Plaintiff's request for an accommodation.

Lastly, relating to Azure's "derogatory" comments, Plaintiff points to one instance about which temporary employee Kayla Monroy testified, where Azure told "everyone to make sure that [Plaintiff] was doing her job, that she was lazy, that she should not be working from home." (Monroy Depo. at 43:3-44:2.) These remarks – which in any event are negative comments about Plaintiff's work ethic, not her disability – may have been insensitive, but they are insufficient to show discriminatory animus, given that Azure made these comments in March and Plaintiff was terminated almost three months later, after a series of other conversations about her performance

issues and the implementation of the PIP, and given that Azure apparently had a dim view of

Plaintiff before her disability was revealed.  This "one-off comment is precisely the sort of 'stray

remark' that is insufficient to support an inference of discriminatory intent."  *Naumovski v.*

*Norris*, 934 F.3d 200, 216 (2d Cir. 2019).  This "scintilla" of evidence does not support a causal

connection between Plaintiff's request for an accommodation and her eventual termination.

Taking her evidence collectively, Plaintiff has not shown a causal connection between

her protected activity and the adverse action.  But even if Plaintiff had managed to support a

*prima facie* case of retaliation, Defendant Iona provides a legitimate, nondiscriminatory reason

for her termination – her continued performance issues.  (Ds' Mem. at 22.)  And as discussed

above, Plaintiff fails to demonstrate any evidence of pretext.

Accordingly, Plaintiff's ADA retaliation claim must be dismissed.

### d.  Hostile Work Environment

Plaintiff alleges that various incidents at her workplace created a hostile work

environment.  "[C]laims for hostile work environment are actionable under the ADA."  *Fox v.*

*Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019).  To prove a hostile work environment

claim, "a plaintiff must establish that the workplace is permeated with discriminatory

intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment."  *Legg v. Ulster County*,

979 F.3d 101, 114 (2d Cir. 2020) (cleaned up).  "This showing has both objective and subjective

elements:  the misconduct shown must be severe or pervasive enough to create an objectively

hostile or abusive work environment, and the victim must also subjectively perceive that

environment to be abusive."  *Id.* (cleaned up).  Furthermore, a plaintiff must demonstrate that the

conduct occurred "because of" the plaintiff's protected status and "that a specific basis exists for

imputing the conduct that created the hostile environment to the employer." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020) (cleaned up).

"The objective hostility of a work environment depends on the totality of the circumstances, viewed from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances, . . . including the social context in which particular behavior occurs and is experienced by its target." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (cleaned up). Accordingly, courts must take care "not to view individual incidents in isolation" or "view the record in piecemeal fashion." *Id.* Factors considered as part of the totality of the circumstances include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." *Legg*, 979 F.3d at 114-15 (cleaned up).

To be deemed "pervasive," discriminatory incidents "must be more than episodic; they must be sufficiently continuous and concerted." *Agosto*, 982 F.3d at 102 (cleaned up). A single incident may suffice to create a hostile work environment, "but to do so it must be extraordinarily severe." *Id.* (cleaned up). "A plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Rodriguez v. County of Nassau*, 830 F. App'x 335, 339 (2d Cir. 2020) (summary order) (cleaned up). Anti-discrimination laws, however, do not "set forth a general civility code for the American workplace," *Redd*, 678 F.3d at 176 (cleaned up), and they "do[] not prohibit employers from maintaining nasty, unpleasant workplaces," *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 513 (S.D.N.Y. 2010).

"The question of whether a work environment is sufficiently hostile . . . is one of fact,"
and "summary judgment is appropriate only if it can be concluded as a matter of law that no
rational juror could view the defendant's conduct as an intolerable alteration of the plaintiff's
working conditions." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001) (cleaned up).
"While this determination may involve difficult line-drawing that is sometimes best left for a
jury, summary judgment is appropriate when reasonable minds could not differ on the issue of
whether a work environment is hostile." *O'Dell v. Trans World Ent. Corp.*, 153 F. Supp. 2d 378,
386 n.3 (S.D.N.Y. 2001) (cleaned up), *aff'd*, 40 F. App'x 628 (2d Cir. 2002) (summary order).

In alleging that her work environment became hostile once Azure learned of her
disability, Plaintiff relies on the same events that she contends showed retaliation.  (P's Opp. at
23-24.)  For the reasons discussed above, they do not show hostility based on disability, but even
if they did, they do not rise to the level of frequency, seriousness, or pervasiveness necessary for
a hostile work environment claim.

Plaintiff testified that during the weekly team calls during quarantine, there were issues
she would want to raise but "[Azure] would cut [her] off when [she] would talk.  She would just
have this anger towards [Plaintiff] when she would talk to [her].  She didn't let [Plaintiff] finish
[her] sentences and she was just very, very rude."  (P's Depo. at 75:24-76:16.)  She testified
about a specific incident where Azure interrupted her and said "We don't have time for this," and
"completely dismissed the conversation."  (*Id.* at 77:3-23.)  Plaintiff also felt that Azure belittled
her:  "she just made me feel like I wasn't part of the team and I wasn't important, and the way
she spoke to me was very disrespectful compared to the way she respected [others]."  (*Id.* at
84:15-85:2.)  And she believed Azure was disrespectful in her tone.  (P's Depo. at 85:3-10.)

Such instances, although perhaps discourteous and unpleasant, "reflect only [a] fraught relationship[] with her supervisor[]." *Harvin v. Manhattan & Bronx Surface Transit Operating Auth.*, 767 F. App'x 123, 128 (2d Cir. 2019) (summary order). They may well have been difficult or stressful for Plaintiff, but that does not make them sufficiently serious such that they are actionable. *See Lambert v. Trump Int'l Hotel & Tower*, 304 F. Supp. 3d 405, 427 (S.D.N.Y. 2018) ("Although these alleged incidents may have been offensive and inappropriate, they are sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded the plaintiff's work environment.") (cleaned up); *Missick v. City of N.Y.*, 707 F. Supp. 2d 336, 355 (E.D.N.Y. 2010) ("[A] pattern of simple discourtesy, without more, has consistently been held insufficient to trigger hostile work environment protections under state or federal law"). No rational jury could find that Plaintiff's workplace was permeated by discriminatory intimidation, ridicule, and insult that was sufficiently pervasive or severe. *See Kugel v. Queens Nassau Nursing Home, Inc.*, 568 F. Supp. 3d 253, 265 ("Although defendants may have been rude or ill-mannered in refusing her accommodation, [Plaintiff] fails to show how such refusals amounted to acts of intimidation, ridicule, or insult required under NYSHRL. Plaintiff is, in other words, merely recycling her ADA failure-to-accommodate claim and unsuccessfully restating it as a hostile work environment claim."). "[E]xcessive criticism and rudeness" simply "do not constitute a hostile work environment." *Ramirez v. Temin & Co.,* 2021 WL 4392303, at *8 (S.D.N.Y. 2021). This is so even if combined with the failure to provide equipment, transfers, or other treatment perceived as negative. *See, e.g.*, *Sealy v. State Univ. of N.Y. at Stony Brook*, 408 F. Supp. 3d 218, 229 (E.D.N.Y. 2019), *aff'd*, 834 F. App'x 611 (2d Cir. 2020).

Finally, even if these incidents were sufficiently serious or pervasive, Plaintiff fails to provide evidence that Defendant Iona's conduct can be attributed to her disability. *See Alfano v.*

*Costello*, 294 F.3d 365, 377 (2d Cir. 2002) ("Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.").  Although Plaintiff has perhaps shown that her "work environment may have been unpleasant – even 'hostile' in ordinary parlance," her claim "must be dismissed because the circumstances do not permit an inference that [s]he was singled out for mistreatment because of [her] disability." *Krasner*, 680 F. Supp. 2d at 519 (cleaned up) – particularly given that Plaintiff found Azure to be rude and disrespectful before anybody had knowledge of Plaintiff's protected characteristic.

 Accordingly, Plaintiff's hostile work environment claim under the ADA is dismissed.

### B. NYSHRL Claims

 The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial.  *Kolari v. N.Y.-Presbyterian Hosp*., 455 F.3d 118, 122 (2d Cir. 2006) (citing 28 U.S.C. § 1367(c)(3)) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  Having granted summary judgment on all claims over which this court has original jurisdiction, and having considered the factors set forth in *Cohill,* I decline to exercise supplemental jurisdiction over Plaintiff's NYSHRL claims, which are dismissed without prejudice.[7]

---

[7] I therefore need not address whether individual liability attaches to Azure as an aider and abettor under the NYSHRL.

## IV.    <u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The federal claims are dismissed with prejudice and the state claims are dismissed without prejudice.  The Clerk of Court is respectfully directed to terminate the pending motion.  (ECF No. 24), enter judgment for Defendants, and close the case.

**SO ORDERED.**

Dated:  August 29, 2022
White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.